108 F.3d 1391
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Alexey T. ZACHARIN, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 96-5076.
 United States Court of Appeals, Federal Circuit.
 Feb. 14, 1997.
 
 Before MICHEL, PLAGER, and BRYSON, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 Alexey T. Zacharin ("Zacharin") appeals from the January 3, 1996 decision of the United States Court of Federal Claims granting the motion of the United States ("the government") for summary judgment and dismissing Zacharin's 28 U.S.C. § 1498 complaint seeking compensation for the unauthorized use of a patented invention on the ground that the government had a valid, express license to use Zacharin's invention. Zacharin v. United States, 34 Fed. Cl. 609, 38 USPQ2d 1826 (Fed.Cl.1996). The case was submitted for our decision after oral argument on November 6, 1996. Because the express license must be read in conjunction with a contemporaneous ultra vires memorandum, the license is void and we therefore vacate and remand.
 
 BACKGROUND
 
 2
 Zacharin is a civilian mechanical engineer employed by the United States Army ("the Army") at Picatinny Arsenal in New Jersey. While so employed, Zacharin invented a device known as a ram-air inflatable decelerator ("RAD"). After inventing the RAD, Zacharin approached Harold Card ("Card"), Chief Patent Counsel at Picatinny Arsenal. Zacharin explained the circumstances surrounding the invention to Card, and Card informed Zacharin that, in order to determine the ownership of any potential patent rights in the RAD, the Army would need to conduct a Determination of Invention Rights pursuant to Executive Order No. 10096, 15 Fed.Reg. 389 (1950) (hereinafter "Executive Order 10096"). Card also informed Zacharin that the Army could prosecute a patent application for Zacharin, but that the Army was required to have a legal interest, such as a license or assignment, in any invention for which it prosecutes a patent application.
 
 
 3
 As Zacharin was concerned about the existence of a potential prior publication bar under 35 U.S.C. § 102(b) and therefore wanted the RAD application prosecuted immediately, he executed an express, non-exclusive, irrevocable, royalty free license ("the express license") in favor of the government on September 21, 1981. However, as Zacharin also believed the government was not entitled to any ownership rights in his invention, Card proposed a Memorandum for Record ("the Memorandum") which was signed by both Card and Zacharin the same day the express license was signed by Zacharin. The Memorandum indicates that Zacharin objected to the Statement of Government Interest[1] included in the RAD patent application and that: (1) Zacharin and Card agreed that the Statement of Government Interest would be canceled if the government had no implied license or ownership rights pursuant to Executive Order 10096; (2) Zacharin would pay the costs of prosecuting the application if the Commissioner of Patents held that the government did not have such rights; and (3) Zacharin would sign the application papers under protest with his objections noted and without waiving any right to claim that the government was not entitled to any implied license or other rights in the RAD invention.
 
 
 4
 On April 23, 1982, the Army's Determination of Rights found that, pursuant to Executive Order 10096, the invention was owned by Zacharin, but that the Army retained a non-exclusive, irrevocable, royalty-free license. Zacharin appealed this decision to the Commissioner of Patents and Trademarks ("Commissioner") and, on April 30, 1985, the Commissioner's Determination of Interest concluded that Zacharin was the sole owner of the invention and that the government was not entitled to any ownership or implied license rights pursuant to Executive Order 10096. The Army filed a request for reconsideration, but it was dismissed as untimely. Zacharin, 1 USPQ2d at 1413.
 
 
 5
 Card, pursuant to his understanding of the parties' agreement, then returned the patent file to Zacharin and presented Zacharin with a bill for the services of the government attorneys in preparing and prosecuting the application. In return, Zacharin tendered a check to the Army, but this check was returned by the Army some seven months later with a letter asserting that Card had no authority to enter into the Memorandum. Zacharin obtained private counsel and continued to prosecute the patent application, eventually obtaining United States Patent No. 4,565,341 ("the '341 patent"), which issued to him on January 21, 1986.
 
 
 6
 Zacharin filed suit against the government on March 31, 1993 under 28 U.S.C. § 1498 seeking reasonable and entire compensation for the government's unauthorized use of the invention of the '341 patent. In 1995, the parties filed cross motions for summary judgment. Zacharin asserted that: (1) the Commissioner's Determination of Interest precluded the Court of Federal Claims from re-examining the ownership issue by reason of collateral estoppel; and (2) the Memorandum was valid and should be enforced, or, alternatively, the express license should be voided under the doctrine of mistake. The government asserted that: (1) the Commissioner's decision was entitled to no preclusive effect; (2) the Memorandum was invalid; and (3) the express license was valid and enforceable.
 
 
 7
 The Court of Federal Claims granted the government's motion on January 3, 1996. Zacharin, 34 Fed. Cl. at 609, 38 USPQ2d at 1826. The Court of Federal Claims rejected Zacharin's collateral estoppel argument on the ground that the Commissioner did not act in a judicial capacity and that the government was prejudiced in its ability to fairly prosecute the case. Although the Court of Federal Claims read the express license and the Memorandum together as the full expression of the parties' intentions, it held that Card lacked authority to bind the government to the terms of the Memorandum. The trial court also held that, due to Card's lack of authority to enter into the Memorandum, Zacharin could not rely on the doctrine of equitable estoppel to have the court refuse to enforce the express license in light of the Memorandum. Finally, the trial court refused to invalidate the express license on the ground of mistake because, it ruled, Zacharin bore the risk of loss in the event the government's agent lacked authority. This timely appeal followed.
 
 ANALYSIS
 
 8
 We review de novo the grant of a motion for summary judgment. Turner v. United States, 901 F.2d 1093, 1095 (Fed.Cir.1990).
 
 I.
 
 9
 Zacharin presents two main arguments on appeal. We first address his contention that the government does not have a valid express license to make and use the RAD because pursuant to the Memorandum entered into by Zacharin and Card, the express license was contingent upon the Commissioner deciding that the government was entitled to rights in the invention by operation of law. In the event that the Commissioner determined that the government had no implied license or ownership rights in the RAD pursuant to Executive Order 10096, the express license would be automatically revoked.
 
 
 10
 We begin by concluding that, although Card may have had authority to accept a routine, standard form express license in the ordinary course on behalf of the government, Card did not have authority to enter into a memorandum which changed the terms of the standard, irrevocable, express license, such as the Memorandum entered into in this case. Chapter 9, entitled "Proffers of Licenses and Assignments to the Government," of Army Regulation 27-60, Patents, Inventions, and Copyrights, provides that:
 
 
 11
 Any officer or employee of a procuring activity shall promptly submit to the chief patent or legal officer of his activity any communications received by him relating to the proffer of licenses or assignments to the Government. Any other person receiving such communications shall transmit them to the Chief, Patents Division, for proper action.
 
 
 12
 Army Regulation 27-60 p 9-1. It further provides that:
 
 
 13
 Promptly after a receipt of a communication proposing a license or an assignment (or after a determination has been made to endeavor to obtain a license or assignment) the designee shall request in writing from the Chief, Patents Division, clearance to consider and procure, if desirable, the license or assignment on behalf of the Department of the Army.
 
 
 14
 Army Regulation 27-60 p 9-3. Thus, the regulation makes clear that only the Chief of the Patents Division for the entire Army has the authority to grant clearance to enter into a license agreement. It is undisputed that Card, although Chief Patent Officer at Picatinny, was not the Chief of the Patents Division as that term is used in the regulation. Thus, he had no authority to accept any licenses or negotiate any license agreements, other than those cleared by the Chief of the Patents Division. Although Card may have had the authority to accept an unconditional express license from Zacharin, he had not received clearance to change the terms of that license by entering into the Memorandum which canceled the express license under certain conditions.
 
 
 15
 Zacharin argues, however, that Chapter 4, entitled "Government Employee Inventions and Invention Rights" of Army Regulation 27-60 grants Card the necessary authority. This chapter, however, provides merely that:
 
 
 16
 a. Direct submission by inventor. For the purpose of obtaining patents, all Government employees may submit their invention disclosures directly to the head of the Army agency or component to which the invention relates. If that agency or component is not supported by a patent section and if it appears that the invention deserves further processing, the head of the agency or component will transmit the invention disclosure to the Chief, Patents Division.
 
 
 17
 b. Correspondence.
 
 
 18
 (1) Direct correspondence between the persons and the agencies or components referred to in a above is authorized, provided that -
 
 
 19
 (a ) Such correspondence pertains solely to unpatented inventions and the patenting thereof.
 
 
 20
 (b ) No invention that has been rejected by the head of any agency or component of the Department of the Army will be submitted to any other agency or component unless accompanied by a statement as to former rejections.
 
 
 21
 ...
 
 
 22
 * * *
 
 
 23
 (3) Correspondence pertaining to submission of invention which is received by the head of any agency or component of the Department of the Army supported by a patent section may, at his discretion, be either -
 
 
 24
 (a ) Handled entirely within the agency or component, or
 
 
 25
 (b ) Referred directly to Chief, Patents Division.
 
 
 26
 Army Regulation 27-60 p 4-4. The chapter also provides that certain standard forms may be used for granting rights in inventions to the government by government employees. Id. at p 4-21.[2] Zacharin also relies on Headquarters U.S. Army Armament Research and Development Command ("ARRADCOM") Supplement 1 to AR 27-60 which provides that Card's office was responsible for "[g]uidance and advice for submitting invention disclosures and preparation of patent applications" and "[e]valuation of invention disclosures for patentability aspects." Contrary to Zacharin's assertions, however, Chapter 4 merely granted Card the authority to enter into routine correspondence. Nothing in Chapter 4 grants Card the authority to enter into a non-routine agreement conditionally revoking the grant of an "irrevocable" express license. Accordingly, nothing in Chapter 4 or Supplement 1 can provide the necessary authority.
 
 
 27
 Moreover, the doctrine of implied actual authority cannot save Zacharin, as drafting such side agreements cannot fairly be said to be an integral part of the duties assigned to Card. See H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed.Cir.1989) (implied actual authority exists when the necessary authority is considered to be an integral part of the duties assigned to the particular government employee). Card was assigned to prepare patent applications, not to determine the terms under which the government would take a license.
 
 
 28
 As Card had no authority to enter into the Memorandum, it is void as ultra vires. See Doe v. United States, 100 F.3d 1576, 1584 (Fed.Cir.1996) ("Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations."); see also Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.... And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.").
 
 
 29
 Although the express license grant executed by Zacharin would appear, on its face, to be a complete defense to Zacharin's suit, it is not an independent and absolute grant, but part of an integrated and conditional agreement consisting of two writings. Zacharin signed two documents at the same meeting: the express license grant to the government which he was told was necessary in order to procure the government's assistance in prosecuting the patent application and the Memorandum (also signed by Card) which Zacharin believed revoked the express license should the administrative decision of the Commissioner be in Zacharin's favor.[3] The government now urges us to invalidate the Memorandum as void ab initio while leaving in place the express license. In light of the circumstances surrounding the drafting of these documents and the language they contain, this we cannot do.
 
 
 30
 The two documents together formed but a single agreement; the terms set forth in the Memorandum were understood by both parties to be an express condition of the grant of the express license. Specifically, Card testified in his deposition that both he and Zacharin understood that the express license would be "torn up or otherwise disposed of" and "would not be allowed to stand" if the government was determined to not have any ownership or implied license rights in the invention pursuant to Executive Order 10096. Zacharin agreed to grant and actually granted the government a license if, and only if, the administrative decision was in favor of the government.
 
 
 31
 Thus, the express license could only be enforced if it were a divisible part of a single contract or an entirely separate contract. It was neither. We presume "that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed.Cir.1992) (refusing to sever a timber contract into parts after breach where both parties intended to enter into a non-divisible contract). Such is the case here. As discussed above, it is beyond doubt that the terms of the Memorandum constituted essential elements of the bargain. See Pennsylvania Exchange Bank v. United States, 170 F.Supp. 629, 632 (Ct.Cl.1959) (refusing to declare a contract divisible after breach where the purpose of the whole contract was thwarted by plaintiff's failure to perform part of the contract). Given that the Commissioner's decision was in favor of Zacharin, enforcing the express license would thwart the parties' express intentions and contradict the Memorandum. We therefore vacate the decision of the trial court granting summary judgment to the government on the ground that it enjoyed a valid express license and remand for a determination of liability in the absence of an express license.
 
 II.
 
 32
 Zacharin also argues on appeal that the Commissioner's determination that the government was not entitled to any rights in the RAD invention pursuant to Executive Order 10096 is a final decision and not subject to judicial review.[4] Zacharin further argues that, based on collateral estoppel principles, this prevents the trial court from considering the circumstances surrounding the making of his invention to determine whether Zacharin is entitled to compensation under section 1498.
 
 
 33
 It is beyond dispute that agency decisions can have preclusive effect in later court actions involving the same facts and parties. See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."). The trial court, however, held that the Commissioner's decision was not entitled to preclusive effect because the government was prejudiced by the lack of adversarial discovery and its inability to examine and cross-examine live witnesses before the Commissioner. We cannot agree with the trial court.
 
 
 34
 Executive Order 10096 provides for "a uniform patent policy for the Government with respect to inventions made by Government employees and for the administration of such policy." It was written with a "view to obtaining uniform application of the policies" set out in the order and to "determine with finality any controversies or disputes between any Government agency and its employees" concerning ownership of inventions.
 
 
 35
 The federal regulations implementing Executive Order 10096 also demonstrate that the procedure set forth in the Executive Order was intended to promote uniformity and finality. Thus, the expressed purpose of the regulations is to "provide for the administration of a uniform patent policy" with respect to inventions made by government employees. 37 C.F.R. § 100.1 (1983). These regulations further provide that each government agency will initially determine the respective rights of the government and the government employee pursuant to the Executive Order. 37 C.F.R. §§ 100.5, 100.6 (1983). The agency's decision is subject to review by the Commissioner. 37 C.F.R. § 100.6 (1983). The Commissioner's decision is final, subject only to reconsideration by the Commissioner. 37 C.F.R. §§ 100.6, 100.7 (1983).
 
 
 36
 It has previously been held that the Executive Order provides the exclusive means for determining ownership rights in inventions made by government employees. Heinemann v. United States, 4 Cl.Ct. 564, 570 (1984) ( Heinemann I ). Moreover, we have previously held that the Commissioner's decision is a final agency action judicially reviewable only under the Administrative Procedure Act ("APA"). Heinemann v. United States, 796 F.2d 451, 454 (Fed.Cir.1986) (Heinemann II ). Thus, if an inventor seeks review of the Commissioner's decision, the reviewing court must examine the Commissioner's decision to determine whether it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Id. at 454-55. There is no review available to the government, however, as the APA does not grant the government the right of review of final agency actions. See 5 U.S.C. § 551(2) (defining "person" as "an individual, partnership, corporation, association, or public or private organization other than an agency") and 5 U.S.C. § 702 (granting a right of review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.").
 
 
 37
 In light of the above, there can be no doubt that the Commissioner's decision was intended to have preclusive effect in any further proceedings between the government employee and the government concerning ownership rights in the patent. The procedures implemented pursuant to the Executive Order would promote neither uniformity nor finality if government employees and government agencies could ignore the Commissioner's decision in later proceedings brought pursuant to 28 U.S.C. § 1498. This conclusion is reinforced by the holding in Heinemann II. There, after upholding the trial court's decision that the Commissioner's determination that the government, not Heinemann, held title to the asserted patent was not arbitrary and capricious or otherwise unlawful, this court affirmed the grant of the government's motion for summary judgment dismissing Heinemann's complaint based on the Commissioner's decision. Heinemann, 796 F.2d at 456. In other words, this court applied collateral estoppel effect to the Commissioner's determination. The government did not perceive a problem in that case where the outcome was in its favor--indeed, the government argued the Commissioner's decision was not even entitled to APA review--and it cannot now be heard to argue that there is no preclusive effect to the Commissioner's decision here where the outcome favors the employee.
 
 
 38
 The government claims certain procedures commonly utilized by courts were lacking in this determination. Had the Commissioner failed to follow certain procedures specified by the applicable regulations and had the failure to apply such procedures indicated that the Commissioner failed to act in a judicial capacity, we might agree with the government. Here, however, the procedures said to be lacking are not unique to this particular case, but rather, are the very same procedures used in every determination of rights initially made by the Army and reviewed by the Commissioner. Moreover, overlooked by the government is the undeniable fact that the government itself chose those procedures it desired in implementing the regulations that were followed in this case. See Army Regulation 27-60 (setting forth the procedures to be followed by the Army) and 38 C.F.R. § 100 et seq. (setting forth the procedures to be followed by all government agencies and the Commissioner). If the government now finds those procedures lacking, its only recourse is to revise the applicable regulations. In light of the clear intent that the procedures implemented pursuant to the Executive Order would finally resolve all disputes between the government and its employees regarding invention rights and in light of the fact that the government itself chose which procedures it would utilize in making such determinations, we cannot agree that the Commissioner did not act in a judicial capacity merely because it didn't utilize certain procedures commonly utilized in court proceedings.
 
 
 39
 In light of our holding that the express license is not valid, we therefore vacate and remand the decision of the trial court. On remand, the trial court should give appropriate effect to the decision of the Commissioner[5] in ruling on whether Zacharin has proven his case under section 1498.
 
 COSTS
 
 40
 Each party to bear its own costs.
 
 
 
 [1]
 The Statement of Government Interest provided that the government could manufacture, use and license the RAD invention without payment of royalties to Zacharin. In re Zacharin, 1 USPQ2d 1413, 1414 n. 1 (Comm'r Patents 1986)
 
 
 [2]
 The form used by Zacharin to convey the express license did not require Card's signature. In fact, it was signed by Zacharin alone
 
 
 [3]
 Although the government asserts we are barred from considering the Memorandum by virtue of the parole evidence rule, we do not agree. The Memorandum itself is a legal instrument executed by both parties. It was contemporaneous with the grant of the express license. It was part of an integrated agreement consisting of both the Memorandum and the express license. Together, they expressed the overall intentions of the parties. Thus, both documents must be read and considered together. See David Nassif Assoc. v. United States, 557 F.2d 249, 256 (Ct.Cl.1977) ("[I]t is not the writing alone which attests to its own finality and completeness but the circumstances surrounding its execution, including the negotiations which produced it.")
 
 
 [4]
 Zacharin also argues that the alleged finality of the Commissioner's decision prevents the government from asserting the express license as a defense. However, even if Zacharin was legally entitled to sole ownership rights in the invention, he is not prohibited from entering into an express license with the government. Regarding licenses, the Commissioner is limited to determining whether an implied license arose by operation of law pursuant to Executive Order 10096, and thus the Commissioner did not, and could not, address the issue of whether the express license granted by Zacharin was valid and binding. Therefore, the Commissioner's decision cannot prevent adjudication at the trial level and review here of that issue
 
 
 [5]
 The government suggests that Zacharin may have fraudulently deceived the Army and the Commissioner. The trial court did not rule on this issue, and we express no opinion regarding whether fraud would be a basis for either reopening the procedures before the Commissioner or refusing to apply collateral estoppel effect to the otherwise preclusive decision of the Commissioner